UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| v. | : | Mag. No. 12-6698 (JAD) |
| | : | **CRIMINAL COMPLAINT** |
| ALEJANDRO JAVIER<br>DAVID PINSKI<br>MICHAEL SENATORE and<br>ROSARIO TERZULLI | : | |

I, Anthony Gonzalez, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Postal Inspector with the United States Postal Inspection Service, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

Anthony Gonzalez, Postal Inspector
United States Postal Inspection Service

Sworn to before me and subscribed in my presence,
September 18, 2012 at Newark, New Jersey

HONORABLE JOSEPH A. DICKSON
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

From at least as early as 2011 through in or around September 2012, in the District of New Jersey and elsewhere, defendants

ALEJANDRO JAVIER
DAVID PINSKI
MICHAEL SENATORE
and
ROSARIO TERZULLI

did knowingly and intentionally conspire and agree with each other and with others to embezzle, steal, purloin, and knowingly convert to their use and the use of others, money of the United States, specifically United States Treasury checks, contrary to Title 18, United States Code, Section 641, in violation of Title 18, United States Code, Section 371.

## Counts Two through Five
(Theft of Government Property)

On or about the dates set forth below, defendants

ALEJANDRO JAVIER
DAVID PINSKI
MICHAEL SENATORE
and
ROSARIO TERZULLI

did knowingly embezzle, steal, purloin, and knowingly convert to their use and the use of others, money of the United States, specifically United States Treasury checks, in violation of Title 18, United States Code, Sections 641 and 2, as follows:

| Count | Defendant | Approximate Date | Approximate Amount |
|---|---|---|---|
| 2 | JAVIER | June 27, 2012 | $100,964 |
| 3 | PINSKI | June 27, 2012 | $100,964 |
| 4 | SENATORE | May 30, 2012 | $15,137 |
| 5 | TERZULLI | May 30, 2012 | $15,137 |

1

ATTACHMENT B

I, Anthony Gonzalez, have been a Postal Inspector with the United States Postal Inspection Service for approximately seven years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based on my personal knowledge and on information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of relevant facts; b) my review of publicly available information relating to the defendants; and c) my review of business records, bank records and other documents and evidence obtained through Court orders, subpoenas and other sources. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in substance and in part.

1. At all times relevant to this Complaint:

    a. The standard form used by United States citizens to file individual federal income tax returns was the Individual Income Tax Return Form 1040 ("Form 1040"). Taxpayers could file Form 1040s either in paper form or electronically.

    b. For electronically-filed Form 1040s, the U.S. Treasury was capable of tracing the specific Internet Protocol ("IP") address[1] from which a particular Form 1040 was filed.

    c. On a Form 1040, taxpayers were required to report, among other things, their wages, withholdings, and applicable tax credits. Based on the information reported in Form 1040s, the United States Treasury Department either required taxpayers to provide additional taxes or paid taxpayers with tax refunds.

    d. The United States Treasury Department (the "U.S. Treasury") paid tax refunds in the form of checks, which were mailed to taxpayers (the "Tax Refund Treasury Checks") or electronically deposited into accounts designated by the taxpayers.

---

[1] Typically, computers or devices on the Internet are referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each Internet Service Provider ("ISP") a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is, they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Therefore, if a customer's ISP employs dynamic IP addressing, the customer's IP address can change over time, even though the customer remains the same and maintains the same account with the ISP.

2

e. Stolen Identity Refund Fraud ("SIRF") was a common type of fraud committed against the United States government that resulted in over $2 billion in losses annually to the United States Treasury.[2]

Background on SIRF

2. From my training and experience, I know that SIRF schemes are a significant and growing problem across the United States. SIRF schemes generally share a number of hallmarks:

   a. First, SIRF perpetrators obtain personal identifying information, including Social Security Numbers and dates of birth, from unwitting individuals, who often reside in the Commonwealth of Puerto Rico.[3]

   b. Second, SIRF participants complete Form 1040s using the fraudulently-obtained information, and falsifying wages earned, taxes withheld and other data (the "Fraudulent Form 1040s"). Perpetrators use data to make it appear that the "taxpayers" listed on the Fraudulent Form 1040s are entitled to tax refunds – when in fact, the various tax withholdings indicated on the Fraudulent Form 1040 taxes have not been paid by the listed "taxpayers," and no refunds are due.

   c. Third, SIRF perpetrators direct Tax Refund Treasury Checks generated by the Fraudulent Form 1040s to locations they control or can access, in various ways, including:

      i. Listing addresses on Fraudulent Form 1040s that the perpetrators could access, and employing runners to remove Tax Refund Treasury Checks from mailboxes at those addresses;

      ii. Enlisting corrupt mail carriers to divert Tax Refund Treasury Checks from the mail stream before delivery; and

      iii. Designating refunds to be electronically deposited into bank accounts under their control.

   d. Fourth, with Tax Refund Treasury Checks now in hand, SIRF perpetrators generate cash proceeds. Certain SIRF perpetrators sell Tax Refund Treasury Checks at a discount to face value. In turn, the buyers then cash the Tax Refund Treasury Checks, either themselves or using straw account holders, by cashing

---

[2] SIRF is also targeted at state taxing authorities in much the same way. Fraudulent state tax returns are submitted in the names of individuals who are not the actual filers in order to obtain fraudulently issued state tax refunds based on false representations of wages and taxes withheld, among others.

[3] Puerto Rican citizens are issued Social Security numbers, but are not required to pay Federal income tax unless they derive income from United States-based companies or from the United States government. Therefore, Social Security numbers assigned to Puerto Ricans are a valuable commodity for perpetrators of SIRFs, because these Social Security numbers are normally not already associated with a Form 1040.

checks at banks or check cashing businesses, or by depositing checks into bank accounts. When cashing or depositing Tax Refund Treasury Checks, SIRF perpetrators often present false or fraudulent identification documents in the names of the "taxpayers" to whom the checks are payable.

3. The multiple steps in a SIRF scheme often require the participation of numerous individuals, who usually occupy specific and distinct roles in the scheme.

Summary of the Investigation

4. Federal law enforcement agencies, recognizing that SIRF was a serious problem, , created a multi-agency task force in New Jersey led by investigators from the United States Postal Inspection Service and the Internal Revenue Service with support from the United States Secret Service, Homeland Security Investigations, and the Drug Enforcement Administration (the "New Jersey Task Force").

5. An investigation led by the New Jersey Task Force has revealed that between at least as early as 2007 and the present, dozens of individuals in the New Jersey and New York area have been engaged in a large-scale, long running SIRF scheme (the "Scheme"). In total, the Scheme has caused more than 8,000 Fraudulent Form 1040s to be filed, seeking more than approximately $65 million in tax refunds, with losses to the U.S. Treasury of more than approximately $11.3 million.

6. The Scheme was carried out by JOSE TORRES, a/k/a "Jose Quilestorres" ("TORRES"), ROBERTO DIAZ, ELIAN MATLOVSKY, PORFIRIO PAREDES, ROSA MARMOL, LUIS MARTINEZ, ENNIO GUZMAN, ALEJANDRO JAVIER, ROBERT PINSKI, MICHAEL SENATORE, ROSARIO TERZULLI, MANUEL RODRIGUEZ, RIGOBERTO TORRES ("R. TORRES") and others (collectively, the "Conspirators").

7. Each Conspirator played a specific role in the Scheme. For example:

   a. **Obtaining Personal Identifying Information from Puerto Rican Citizens:** TORRES, RODRIGUEZ, and others obtained personal identifiers, such as dates of birth and social security numbers, belonging to Puerto Rican citizens.

   b. **Creating Fraudulent Form 1040s:** TORRES, RODRIGUEZ and others used those identifiers to create Fraudulent Form 1040s, which falsely reported wages purportedly earned by the "taxpayers" and taxes purportedly withheld, to create the appearance that the "taxpayers" were entitled to tax refunds. Of course, the amounts were fraudulent.

   c. Moreover, the Fraudulent Form 1040s submitted by TORRES, RODRIGUEZ, and others listed the same employers and home addresses for numerous different "taxpayers."

d. **Filing the Fraudulent Form 1040s:** The Fraudulent Form 1040s made in furtherance of the Scheme were created and filed electronically. By tracing the specific IP addresses that submitted the electronically-filed Form 1040s, law enforcement officers learned that just a handful of IP addresses created many of the Fraudulent Form 1040s used in the Scheme. These Fraudulent Form 1040s in turn led to the issuance of Tax Refund Treasury Checks that the Conspirators obtained, sold, cashed, and spent.

e. **Obtaining the Fraudulently-Issued Tax Refund Treasury Checks:** TORRES, RODRIGUEZ and others then gained control of Tax Refund Treasury Checks, in various ways, which followed the pattern of a classic SIRF scheme:

   i. Sometimes, Conspirators obtained Tax Refund Treasury Checks by bribing mail carriers to intercept checks and deliver them to other Conspirators. One such mail carrier, BENNIE HAYNES, who delivered mail along a route in Somerset, New Jersey, has previously been charged. In exchange for cash payments, HAYNES gave Tax Refund Treasury Checks to Conspirators. These Conspirators gave the checks to TORRES and others. In turn, TORRES then sold these checks to yet other Conspirators. Tax Refund Treasury Checks mailed to addresses along HAYNES's mail route in Somerset, New Jersey were deposited into accounts controlled by DIAZ, MATLOVSKY, RODRIGUEZ and R. TORRES.

   ii. TORRES and others also purchased "mail routes," that is, lists of addresses covered by a single mail carrier, from other Conspirators, including DIAZ. Again, once the mail route was purchased, TORRES and others applied for Tax Refund Treasury Checks, inserted addresses along the mail route as the purported home addresses of the "taxpayers," and obtained the Tax Refund Treasury Checks sent to the addresses.

   iii. In other instances, the Conspirators applied for checks using addresses otherwise controlled by, or accessible by, certain Conspirators, and collected the checks after they were delivered to those addresses. For example, during the course of the Scheme, hundreds of Tax Refund Treasury Checks were mailed to just a few different addresses in a few different towns, including Nutley, Somerset and Newark, New Jersey, and Shirley, New York.

f. **Selling the Tax Refund Treasury Checks to Other Conspirators:** TORRES and others then sold Tax Refund Treasury Checks to DIAZ, PAREDES, JAVIER, RODRIGUEZ, and others.

g. **Depositing and Cashing the Tax Refund Treasury Checks:** After buying the Tax Refund Treasury Checks from TORRES and others, DIAZ, PAREDES,

JAVIER, RODRIGUEZ, and others deposited and cashed the checks. Again, the Conspirators used several methods:

   i. They induced third parties (the "Straw Account Holders"), including MATLOVSKY and GUZMAN, to open bank accounts at various banks in New Jersey and elsewhere. Once the Tax Refund Treasury Checks were deposited into the Straw Account Holders' accounts or accounts controlled by Conspirators, DIAZ, MATLOVSKY, GUZMAN PAREDES, JAVIER, PINSKI, RODRIGUEZ, R. TORRES, MARMOL, MARTINEZ and others caused proceeds of the fraud to be withdrawn, and spent those funds or transferred a portion of the funds to other Conspirators.

   ii. RODRIGUEZ, PAREDES, SENATORE, PINSKI, JAVIER, TERZULLI and others also obtained proceeds from Tax Refund Treasury Checks by causing checks to be cashed at check cashing institutions, and then causing the proceeds to be deposited into bank accounts controlled by Conspirators.

   iii. They bought, or tried to buy, check cashing businesses, so that they would have more stable venues for cashing Tax Refund Treasury Checks. TORRES, DIAZ, and GUZMAN, among others, discussed purchasing a check cashing business to further the Scheme.

Making Connections Between Conspirators – the Scope of the Scheme

8. As set forth above, each Conspirator played a particular role in the Scheme. Not every Conspirator engaged with every other Conspirator, and so certain Conspirators are charged in separate complaints. But computer analysis, along with statements from cooperating witnesses, intercepted communications, consensually-recorded meetings, surveillance, subpoenaed records, and other investigative techniques, have revealed the web of connections between and among the Conspirators.

9. As just a couple of examples, law enforcement has identified specific IP addresses linked to TORRES (who is charged by separate Complaint), which were used to file thousands of Fraudulent Form 1040s.

10. One IP address linked to TORRES was discovered after law enforcement officers introduced a confidential informant ("CI-1") to DIAZ. Law enforcement officers provided CI-1 with a mail route for addresses in Cliffside Park, New Jersey (the "Cliffside Park Mail Route"). In or around June 2011, CI-1 gave DIAZ the Cliffside Park Mail Route. CI-1 told DIAZ that the mail carrier for the Cliffside Park Mail Route was complicit in the scheme, and would remove Tax Refund Treasury Checks from the mail stream for the Conspirators.

11. Shortly thereafter, DIAZ provided the Cliffside Park Mail Route to TORRES. Subsequently, dozens of Fraudulent Form 1040s were created from a single IP address, using addresses along the Cliffside Park Mail Route ("IP Address 1").

12. Law enforcement officers then analyzed IP Address 1, and discovered that IP Address 1 had created a total of approximately 2,033 Fraudulent Form 1040s, all bearing Puerto Rican names. Moreover, other Conspirators, including DIAZ, MATLOVSKY, GUZMAN, PAREDES, and R. TORRES, had deposited or caused to be deposited Tax Refund Treasury Checks, which had been issued based on Fraudulent Form 1040s filed from IP Address 1, in furtherance of the Scheme.

13. On or about August 19, 2011, DIAZ caused a Tax Refund Treasury Check he obtained from TORRES to be deposited into an account MATLOVSKY controlled. The IP address that filed the Fraudulent Form 1040 for this check ("IP Address 2") was also associated with the filing of approximately 1,648 Fraudulent Form 1040s. Moreover, PAREDES and R. TORRES, too, deposited or caused to be deposited Tax Refund Treasury Checks that resulted from Fraudulent Form 1040s filed from IP Address 2.

14. In total, Tax Refund Treasury Checks resulting from Fraudulent Form 1040s filed utilizing the IP addresses linked to TORRES were deposited by DIAZ, MATLOVSKY, GUZMAN, R. TORRES, and PAREDES, among others.

15. Consensually recorded conversations further linked the Conspirators together. During recorded conversations with a Cooperating Witness ("CW-1"), TORRES referred to PINSKI and JAVIER, and stated that he believed PINSKI and JAVIER had been arrested and/or were under investigation for engaging in the Scheme.

16. In addition, intercepted communications laid bare yet other connections between Conspirators. Law enforcement officers maintained a Court-authorized wiretap on PINSKI's cellular telephone for approximately three months in or around 2012. During conversations intercepted through this wiretap, PINSKI, JAVIER, and SENATORE engaged in dozens of conversations relating to the Scheme, and discussed, in granular detail, the specifics of SIRFs, and of the Scheme in particular.

<u>Law Enforcement Officers Intercept More than $22 Million in Tax Refund Treasury Checks, Mitigating the Harm Caused by the Scheme</u>

17. During the course of the investigation, members of the New Jersey Task Force identified certain "hot spots" of activity related to the Scheme – that is, Conspirators were directing millions of dollars worth of Tax Refund Treasury Checks to just a few towns and cities in and around New Jersey. New Jersey Task Force members then interacted with United States Postal Service employees in these hot spots, and identified the characteristics of Tax Refund Treasury Checks connected to the Scheme. As a result of these efforts, more than $22 million in fraudulently-applied for Tax Refund Treasury Checks that had been issued by the U.S. Treasury were not delivered to the Conspirators or others, but rather were interdicted by law enforcement officers.

Certain Conspirators Engage in Lavish Personal Spending with Stolen Public Money

18. Several of the Conspirators used the proceeds of the fraud to enjoy a lavish lifestyle. As just one example, DIAZ, who purportedly worked in the grocery business, resided in a house worth over $1.6 million, and paid over $13,000 per month – from accounts associated with the fraud – in mortgage payments on this house; he gambled over $250,000 at casinos in New Jersey and elsewhere; he purchased two Mercedes-Benz automobiles; and he took high-end vacations to Miami and elsewhere, spending thousands of dollars a night on luxury hotels.

19. As another example, MATLOVSKY, who was a school teacher, charged approximately $123,000 on a single credit card in just one year, including such charges as:

   a. Tens of thousands of dollars in hotel and airfare for numerous luxury vacations to Cancun, Miami Beach, Panama City, Atlantic City, Fort Lauderdale, Puerto Rico, the Dominican Republic, Israel, and elsewhere;

   b. Over $4,000 in shopping on a single day;

   c. Restaurant tabs of over $1,300 for a single meal; and

   d. Tens of thousands of dollars in high-end furniture.

The Roles of the Defendants

20. PINSKI resided in or around Fort Lee, New Jersey. JAVIER resided in or around Newark, New Jersey. SENATORE resided in or around Moscow, Pennsylvania. TERZULLI resided in or around Brooklyn, New York.

21. As early as in or around 2011, PINSKI and JAVIER partnered to purchase Tax Refund Treasury Checks from TORRES and others and then caused more than $1.3 million in Tax Refund Treasury Checks to be negotiated at check cashing stores and other locations, using SENATORE and TERZULLI to effectuate the negotiation of the checks.

22. PINSKI used his connections to money launderers to borrow the money to purchase the Tax Refund Treasury Checks. JAVIER used his connections to TORRES to buy the Tax Refund Treasury Checks. SENATORE and TERZULLI used their connections with owners of check cashing locations to negotiate the checks. In total, PINSKI, JAVIER, SENATORE, and TERZULLI caused the deposit of over $1.3 million in Tax Refund Treasury Checks.

PINSKI & JAVIER

23. JAVIER has longstanding connections to TORRES. First, in or around June 2011, CI-1 stated to law enforcement officers that JAVIER had introduced DIAZ to TORRES.

Moreover, RODRIGUEZ stated to law enforcement officers that JAVIER's wife, R.C., introduced RODRIGUEZ to TORRES. JAVIER assisted PINSKI in obtaining Tax Refund Treasury Checks from TORRES and others, which PINSKI and JAVIER purchased at a discount to face value.

24. PINSKI associated with individuals who laundered money between the United States, Israel, and elsewhere, and relied on his money laundering connections to borrow money to purchase Tax Refund Treasury Checks. PINSKI maintained several bank accounts, which were used to receive both money from his money laundering associates, and to deposit funds from Tax Refund Treasury Checks. In or around June 2012, law enforcement seized approximately $1,426,093.71 in United States currency from one of PINSKI's bank accounts.

25. In or around March 2012, law enforcement officers obtained a Court order to intercept communications on PINSKI's cellular telephone. This interception uncovered hundreds of telephone calls between PINSKI and JAVIER, during which PINSKI, JAVIER, and SENATORE discussed their purchase and sale of Tax Refund Treasury Checks. Examples of some of these calls are set forth below. The descriptions of the intercepted conversations are partial, non-verbatim summaries based on descriptions of the conversations prepared by monitors. In these descriptions, comments enclosed in parentheses are based upon my knowledge, training, and experience, the knowledge, training, and experience of other law enforcement agents with whom I have spoken, and the results of the investigation to date. All times ascribed to conversations and other events are approximate.

   a. On or about May 5, 2012, JAVIER called PINSKI. JAVIER stated that a "guy" (referring to SENATORE) called him because there was an "error" with the "Alvarado" check because the check casher wanted "the name and the full address" of the purported payee. PINKSI asked JAVIER for additional time to get the requested information. (JAVIER is saying that the face of one of the fraudulent Tax Refund Treasury Check does not have all of the proper information and requested this information from PINSKI.)

   b. A few minutes later, JAVIER called PINSKI again, and stated that the check he referred to during their earlier conversation was for "Ivan Morales-Perez" "from the 3 that need to be resolved . . . The guys are calling me. They want to be paid, but the address is wrong. Ivan Morales-Perez." (JAVIER is stating that the address for this check appears to be incorrect and the check cannot be cashed without the "correct" information.) PINSKI replied that he would provide the information shortly. PINSKI later called JAVIER back and provided the address on the Ivan Morales-Perez Tax Refund Treasury Check to JAVIER.

   c. PINSKI and JAVIER also discussed the fraudulent identification documents that they used to cash Tax Refund Treasury Checks. For example, on or about May 5, 2012, the false document creator had made a mistake, and used a New York State license for a Tax Refund Treasury Check that had been addressed to a location in

9

New Jersey. PINSKI complained, "They put a New York license, but it's in New Jersey. . . . There has to be a New Jersey License. I wrote it very clearly." JAVIER replied, "Well, it's not possible because it has to be the same address that's on the check. It has to be the same address." (JAVIER is stating that the false identification document and the Tax Refund Treasury Check must have identical addresses.) PINSKI replied, "It's Plainfield, in New Jersey. He can't put a New York license on a New Jersey check." (PINSKI is stating that, to cash a Tax Refund Treasury Check made out to an address in New Jersey, the fake identification document must also be made out to an address in New Jersey.)

d. Later that day, PINSKI complained to JAVIER that the document creator was "an idiot," because the document creator had incorrectly made a false and fraudulent New York state driver's license for a check purportedly going to a New Jersey address, and thereby exposed the Co-Conspirators to arrest. PINSKI recounted that he told the document creator, "'If you don't have a machine to make Jersey licenses, then bring me another check, instead of this one.'" (PINSKI is telling JAVIER that the document creator does not have the capacity to make fake New Jersey licenses.) JAVIER replied, "So he, he took it?" (JAVIER is asking whether the document creator took the check back.) PINSKI stated, "He took it back, to give me another one . . . . I tell him, what you want, for us to go to jail?" (PINSKI is stating that the document creator's sloppiness could cause all of the Conspirators to be arrested for their illegal activities.) JAVIER replied, "Damn, just like that, well said." PINSKI then stated, "And right there, he tells me that for the other check that you brought me from New Jersey, he can't do the face, because he doesn't have the machine. I told him, 'so then, why do you bring [it to] me . . . . if you can't do it, don't do a bad job.'" (PINSKI refers to a check that JAVIER brought to PINSKI, and that the document creator could not create a convincing false identification document for that check.) JAVIER replied, "Of course."

e. On or about May 11, 2012, during a conversation between PINSKI and JAVIER, PINSKI told JAVIER that SENATORE had delivered approximately $15,700 – money that had been obtained from cashed Tax Refund Treasury Checks – to PINSKI. PINSKI stated, "We are going to collect and then I'm going to tell Mike (SENATORE) to move the old ones." (PINSKI is stating that he and JAVIER will collect money from outstanding Tax Refund Treasury Checks, and have SENATORE work on cashing Tax Refund Treasury Checks from prior years, which are more difficult to cash).

f. Later that day, during a conversation between JAVIER and PINSKI, PINSKI told JAVIER that SENATORE could not cash one of the checks because it had been "rejected" because the social security information belonged to an individual who "lived in Puerto Rico or something like that . . . ." PINSKI and JAVIER discussed getting the "rejected" Treasury Check back from the check cashing establishment and PINSKI assured JAVIER that "nothing happened" (referring to

10

the fact that the Treasury Check had not been confiscated by the check cashing establishment).

    g. PINSKI and JAVIER also discussed the age of Tax Refund Treasury checks, and the difficulties in cashing checks from prior tax years. For example, on or about May 24, 2012, JAVIER called PINSKI. PINSKI asked, "What happened with the other guy, he didn't give you of the new ones?" (PINSKI is asking whether a source of Tax Refund Treasury Checks – possibly TORRES – provided Tax Refund Treasury Checks from the current tax year or not.) JAVIER replied, "No . . . because they weren't there; the ones he had were old and I didn't want those." (JAVIER is telling PINKSI that the source only had checks from prior tax years.) Later on the same call, the two discussed the creation of fraudulent identification cards. PINSKI asked, "Who is the one who will do the 'faces'?" (PINSKI is asking whether JAVIER has a co-conspirator to create fraudulent identification documents to assist in cashing the Tax Refund Treasury Checks.) JAVIER replied, "I'm going to have to find a new person because this guy has resulted in nothing, just a problem. Let me see." PINSKI stated, "Look for New Jersey so they can make the 'faces' because [] they know how to do it in New Jersey." (PINSKI wants to make sure that the document creator knows how to make New Jersey state fake identification documents.)

26. Beyond the intercepted conversations, however, law enforcement officers also obtained evidence of PINSKI and JAVIER's involvement in the Scheme from a consensual search of PINSKI's residence, which uncovered numerous Tax Refund Treasury Checks and corresponding fraudulent identification documents. Specifically, on or about June 27, 2012, law enforcement officers observed PINSKI and JAVIER arrive at PINSKI's residence together. After obtaining PINSKI's consent to search the residence, law enforcement officers discovered approximately fifteen Tax Refund Treasury Checks, each made out to a Puerto Rican citizen. Together, the fifteen Tax Refund Treasury Checks had a face value of approximately $100,964. Moreover, law enforcement officers found fraudulent identification documents – New Jersey drivers' licenses and Social Security cards – that corresponded to each Tax Refund Treasury Check found in PINSKI's residence. During the course of the search, PINSKI stated to law enforcement officers, in sum and substance and among other things, that JAVIER had provided the approximately fifteen Tax Refund Treasury Checks to PINSKI earlier that day.

<u>SENATORE</u>

27. SENATORE also participated in numerous conversations that were intercepted pursuant to the Court-authorized wiretap. These calls demonstrate that SENATORE was intimately involved in the Scheme, by taking Tax Refund Treasury Checks from PINSKI and JAVIER and causing them to be cashed at check cashing locations.

    a. On or about April 24, 2012, PINSKI spoke to SENATORE. PINSKI asked, "Tell me something, how many more you want [me to] bring?" (PINSKI is asking SENATORE how many Tax Refund Treasury Checks SENATORE thinks can be

11

cashed.) SENATORE replied, "Oh, man . . . and this gotta be New Jersey, right?" (SENATORE is asking PINSKI whether the Tax Refund Treasury Checks must contain New Jersey addresses.) PINSKI replied, "Yes. Jersey, New York, both. All new ones." (PINSKI is stating that the Tax Refund Treasury Checks may list either New Jersey or New York addresses, and that they must be from the current tax year, thereby making them easier to negotiate.) SENATORE replied, "Whatever you say. Whatever you say." PINSKI then stated, "I give you like ten." (PINSKI is telling SENATORE that PINSKI will provide SENATORE with approximately ten Tax Refund Treasury Checks.)

b. On or about May 2, 2012, PINSKI told SENATORE that "today I'm gonna have fifteen checks . . . for you." Later that day, PINSKI called SENATORE and stated, "Today you finish everything, the other thing, and I give you this fifteen extra." (PINSKI is telling SENATORE that if SENATORE finishes cashing the Tax Refund Treasury Checks SENATORE currently possesses, PINSKI will then give SENATORE an additional fifteen Tax Refund Treasury Checks to cash.) SENATORE replied in the affirmative.

c. On or about May 12, 2012, PINSKI and JAVIER discussed a Tax Refund Treasury Check that SENATORE and TERZULLI tried to cash, but which was rejected. PINSKI stated, "Mike [SENATORE] told me he [TERZULLI] tried to deposit one in New York and it was rejected. The social security, the guy lived in Puerto Rico, I don't know, something like that, I don't know, that's what they told him. On Tuesday they will bring, it's gonna be 67 in New Jersey." (PINSKI is stating that SENATORE told PINSKI that SENATORE and TERZULLI tried to deposit a Tax Refund Treasury Check in New York, but that they failed to do so. PINSKI states further that shortly, the Co-Conspirators will receive approximately 67 Tax Refund Treasury Checks with New Jersey addresses.) JAVIER replied, "He will bring that one back, no?" (JAVIER wants to make sure that SENATORE will return the uncashed check.)

d. On or about May 14, 2012, JAVIER, PINSKI and SENATORE discussed which Treasury Checks they should attempt to cash. PINSKI told JAVIER that SENATORE was with him. JAVIER instructed PINSKI not to give SENATORE the "old ones" (referring to Tax Refund Treasury Checks from prior tax years) because JAVIER would have "new ones" (meaning more recent Tax Refund Treasury Checks) the following day. PINSKI also told JAVIER that PINSKI had all the information regarding the Tax Refund Treasury Checks written down on the outside of the envelopes that held the checks: "I have [them] written down one by one. And I have everything he gave me. I have them in envelopes without having opened them . . . So I have everything written down."

## TERZULLI

28. SENATORE provided Tax Refund Treasury Checks to TERZULLI, who then cashed them in furtherance of the Scheme.

29. On or about May 30, 2012, law enforcement officers observed SENATORE and PINSKI meet outside a bank in or around Fort Lee, New Jersey. PINSKI handed SENATORE an envelope. Shortly thereafter, law enforcement officers observed SENATORE meet TERZULLI at a gas station, also in or around Fort Lee, get into and, then out of, TERZULLI's vehicle, and TERZULLI drove away. TERZULLI drove directly from the gas station to a check cashing business in or around Bergenfield, New Jersey (the "Bergenfield Check Casher"). When TERZULLI left the Bergenfield Check Casher a short time later, he was carrying an envelope. TERZULLI then drove back to Fort Lee and met SENATORE again, this time at a second gas station. Law enforcement officers saw TERZULLI hand SENATORE an envelope – identical in appearance to the one TERZULLI carried from the Bergenfield Check Casher. Finally, law enforcement officers watched SENATORE leave the second gas station, drive to New York, and enter a building that PINSKI had entered earlier.

30. Law enforcement later learned that on or about May 30, 2012, the Bergenfield Check Casher had cashed approximately two Tax Refund Treasury Checks, in the total amount of approximately $15,137. One of the two Tax Refund Treasury Checks was addressed to a Puerto Rican citizen, with a purported address in the Bronx, New York, and the other was addressed to a Puerto Rican citizen with a purported address in New York, New York.

31. Law enforcement officers have interviewed an employee (the "Check Casher") of a check cashing business frequented by TERZULLI. The Check Casher stated that TERZULLI had cashed Tax Refund Treasury Checks at the Check Casher's business, including checks in the names of Puerto Rican citizens. The Check Casher also stated that TERZULLI had brought identification documents with him when cashing Tax Refund Treasury Checks, but that sometimes, the identification documents did not match the name on the Tax Refund Treasury Checks. On at least one occasion, when the Check Casher refused to cash a Tax Refund Treasury Check with mismatched identification documents, TERZULLI had told the Check Casher that TERZULLI would return to the Check Casher's business with the correct information.

## FORFEITURE ALLEGATIONS

1. The allegations contained in paragraphs 1 through 31 of this Complaint are hereby realleged and incorporated by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. The United States hereby gives notice to the defendants that, upon conviction of the offenses charged in this Complaint, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly traceable to such offenses, including but not limited to the following:

   a. a sum of money equal to at least $1,379,464.09, for which the defendants are jointly and severally liable; and

   b. a sum of money equal to at least $1,426,093.71 in United States currency, seized from an account controlled by PINSKI.

3. If by any act a result of any act or omission of the defendants, any of the property subject to forfeiture described in paragraph 2 herein:
   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

   it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in paragraph 2.